UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| In re: Chicago Board Options Exchange Volatility Index Manipulation Antitrust Litigation | Case No. 18-cv-4171<br>MDL No. 2842<br>Honorable Manish S. Shah<br><br>This Document Relates to All Cases |

**RESPONSE OF QUINN EMANUEL AND ROBBINS GELLER IN SUPPORT OF APPLICATION FOR APPOINTMENT AS CO-LEAD COUNSEL, AND PROPOSAL FOR THE STREAMLINED PROSECUTION OF A SINGLE CONSOLIDATED COMPLAINT**

## **TABLE OF CONTENTS**

**Page**

I. THE CLASS IS NOT WELL SERVED BY DEAL-MAKING THAT RESULTS IN LARGE AND INEFFICIENT LEADERSHIP STRUCTURES ...................................1

II. THERE ARE NO CONFLICTS THAT REQUIRE SEVERING RESPONSIBILITY FOR CLAIMS...................................................................................3

III. THE COMPETING APPLICATIONS HAVE ALREADY DEMONSTRATED THEIR INHERENT INEFFICIENCY ...................................................................6

IV. QUINN EMANUEL AND ROBBINS GELLER HAVE ALREADY DEMONSTRATED LEADERSHIP ..................................................................................7

CONCLUSION....................................................................................................................9

Our opening brief (Dkt. No. 74) demonstrates that Quinn Emanuel and Robbins Geller offer unique experience, superior resources, a diverse and talented team, and a proven commitment to these cases for the benefit of the class. And only Quinn Emanuel and Robbins Geller took heed of the Court's request that counsel make a concrete proposal for the next phase of this litigation. The Quinn Emanuel and Robbins Geller proposal provides a roadmap of how this case should proceed under a single consolidated complaint, and ensures all claims will be attended to with diligence and efficiency. We respectfully submit this brief in response to the competing applications seeking leadership positions in this case.

**I.   THE CLASS IS NOT WELL SERVED BY DEAL-MAKING THAT RESULTS IN LARGE AND INEFFICIENT LEADERSHIP STRUCTURES**

Leadership appointments are designed to ensure the efficient prosecution of a complex lawsuit. *See Manual for Complex Litig.*, Federal Judicial Center, at § 21.11 (4th ed. 2004). Large leadership structures "can lead to substantially increased costs and unnecessary duplication of efforts," *In re Crude Oil Commodity Futures Litig.*, 2012 WL 569195, at *2 (S.D.N.Y. Feb. 14, 2012), where such inefficiencies are contrary to the interests of all class members, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 6050431, at *5-6 (N.D. Ill. Nov. 15, 2013).[1]

As part of the Court's "fiduciary duty to the class," it is important to examine closely the efficiency of the current applications—including the so-called "Consensus Proposal" Application (which is not joined by counsel in at least 9 of the consolidated actions). *Newberg on Class Actions* § 10:11 (5th ed. 2018); *Manual for Complex Litig.*, Federal Judicial Center, at § 10.22 (4th ed. 2004). Such scrutiny is required because of the risk that counsel might "propose

---

[1] Indeed, efficiency is one of the fundamental reasons this MDL exists at all. *See In re Chicago Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 2018 WL 3014955, at *1 (J.P.M.L. Jun. 14, 2018) (centralizing actions to "promote the just and efficient conduct of this litigation").

multiple classes and subclasses primarily to gain appointment to positions of leadership in the litigation" even though "[o]ften only one team of attorneys is necessary, even when the cases have been separated into groups." *Managing Related Proposed Class Actions in Multidistrict Litigation*, Federal Judicial Center, at 7 (May 31, 2018).

Courts recognize that support from other firms for a "consensus proposal" is irrelevant because it is self-serving. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56, 58 (E.D.N.Y. 2006) ("[T]he number of attorneys supporting a given candidacy is not included among the factors set forth in Rule 23(g)"). And they recognize such support can be a red flag that behind doors quid-pro-quo deal-making has occurred, at the expense of the class. *See* Third Circuit Task Force, *Report on Selection of Class Counsel*, 74 Temp. L. Rev. 689, 697 (2001) ("[V]oluntary agreements among lawyers may create cartel-like groupings . . . In order to reach a 'deal,' lead counsel may have to 'cut in' so many lawyers that the representation of the class becomes inefficient and the ultimate fee request becomes inflated.").

At bottom, no amount of "extensive coordination" among counsel or "private ordering" can overcome the inefficiencies inherent in a 'full employment' proposal like that offered by Kessler Topaz and Scott+Scott, which seeks to place at least *six* firms in formal leadership roles—two lead counsel firms, three more firms on a steering committee, and then, because none of those five firms have a Chicago presence, a sixth firm serving as "liaison" counsel.[2] In contrast, our proposal is that our two firms serve as lead counsel, utilizing our own Chicago

---

[2] The "Consensus Proposal" Application (Dkt. No. 91) proposes a three-firm steering committee comprised of Hausfeld LLP, Kellogg, Hansen, Todd, Figel & Frederick PLLC, and a third member, plus Korein Tillery as liaison counsel.

offices, and drawing upon our unparalleled resources throughout the United States.[3]  It is, by far, the most efficient leadership structure presented to the Court.

## II. THERE ARE NO CONFLICTS THAT REQUIRE SEVERING RESPONSIBILITY FOR CLAIMS

In addition to proposing bloated leadership structures, the competing applications each propose that the case be divided up in some fashion, including by proposing that the Court artificially confine Quinn Emanuel and Robbins Geller to the securities claims alone, while appointing numerous other firms to share responsibility for the rest.  But this Court has already recognized there are no conflicts between the claims or products types that require the appointment of separate counsel.  July 11, 2018 Hr'g Tr. at 12:19-25.  And such an approach can foster territorial disputes among class counsel.  The competing applications thus propose to sacrifice efficiency without any benefit to the class.

Not only has the Court already recognized that no actual conflict of interest arises here, no counsel contends otherwise.[4]  This is unsurprising given the broad agreement that "the same evidence will establish liability" as to both the liability of the manipulators and of the CBOE for knowingly failing to prevent that manipulation.  "Consensus Proposal" Application (Dkt. No. 91), at 11.  *See also* Bueno Application (Dkt. No. 74), at 3 ("All claims here arise from the same nucleus of operative fact and are held by an overlapping, if not identical, pool of investors").

---

[3]  As set forth in our opening brief (Dkt. No. 74), we are not adverse to the Court's suggestion of utilizing additional firms, in the sense that we support the eventual creation of a small panel who could perform discrete tasks under lead counsel's supervision.  But we envision this panel would be much more limited than a formal "steering committee," and may be unnecessary at this time under our CBOE-first proposal.

[4]  At most counsel refer vaguely to the *potential* for *future* conflicts.  *See, e.g.*, Korein Tillery Application to Appoint Kessler Topaz and Scott+Scott (Dkt. No. 83), at 2 ("While there is no conflict between different plaintiffs, divergences could *possibly* arise in the future given the different financial products and claims at issue."); *see also id.*, at 6 (stating that "tensions *may* arise during settlement") (emphasis added).

3

Despite acknowledging the commonality of the facts underlying all claims, some applications point to minor differences in the various complaints, such as variation in the class periods of the pleadings subject to consolidation. *See, e.g.*, Hausfeld Application (Dkt. No. 89), at 4. Yet such initial differences are common at the outset of MDLs like this one, where a number of class actions concerning the same subject matter are originally filed by different counsel. They are resolved by the appointment of lead counsel who prepares a consolidated complaint, not by appointing separate counsel to handle each difference in how the claims were initially pled. *See Manual for Complex Litig.,* Federal Judicial Center, at § 21.11 (4th ed. 2004).

The competing applications also seize on the fact that Quinn Emanuel and Robbins Geller brought claims under the Securities Exchange Act, governed by the PSLRA, to argue that we should not be given responsibility for any other claims (and should instead be demoted to a "Steering Committee" position for the securities law claims). *See, e.g.*, "Consensus Proposal" Application (Dkt. No. 91), at 12; Labaton Sucharow and DiCello Levitt Application (Dkt. No. 73) at 5. But we submit this gets exactly backwards the import of the fact that we identified the Securities Exchange Act as a sound legal basis for pursuing certain of the class' claims. That fact shows we have already advanced the interests of the class as a whole and thus supports our application to serve as lead counsel for the class as a whole. Bueno Application (Dkt. No. 74), at 7 ("we were the first to recognize that VIX Options and SPX Options—which are central to *all* plaintiffs' allegations in this case—require claims under the Exchange Act").

The Securities Exchange Act claims arise out of *identical* underlying misconduct as all other claims, and there are no present conflicts between the securities law claims and the other claims. Some competing applications resort to arguing that "[t]here is a different regime for appointing leadership under the PSLRA as compared to non-PSLRA claims." Kaplan Fox Application (Dkt. No. 70), at 11; Cohen Milstein and Cafferty Clobes Application (Dkt. No. 63),

4

at 4-5. This is true, but irrelevant. Two procedural mechanisms can reach the same substantive conclusion. That is the case here, where the class would be best served by the joint appointment of our two firms to handle all claims, in a single consolidated complaint, whether the class' interests are judged under the standards of the PSLRA or Rule 23(g).

Other competing applications note that the PSLRA requires that discovery be stayed until after the motion to dismiss stage. Labaton Sucharow and DiCello Levitt Application (Dkt. No. 73) at 6-7. We submit that is irrelevant as well, for the following reasons: (a) discovery frequently is stayed during motion to dismiss briefing in large market manipulation class actions even where the PSLRA does not apply;[5] (b) the Court already vacated all orders allowing early discovery and indicated it wants to "test" the claims before discovery, July 11, 2018 Hr'g Tr. at 14:120-12; (c) counsel have divergent views about what claims could actually survive such a test absent early discovery; and (d) even if the Court were inclined to revisit the early-discovery question, it would have discretion to do so whether or not the PSLRA default stay applies.[6]

---

[5] *See, e.g.*, *Cemail v. Viking Dodge, Inc.*, 1997 WL 359962, at *1 (N.D. Ill. Jun. 17, 1997) (staying discovery pending resolution of motion to dismiss); *In Re Commodity Exchange, Inc., Gold Futures and Options Trading Litigation*, No. 14-md-2548 (S.D.N.Y. Oct. 2, 2014), Dkt. No. 12, at 2 (same); *In re N. Sea Brent Crude Oil Futures Litig.*, 13-md-2475 (S.D.N.Y. Apr. 22, 2014), Dkt. No. 123 at 4 (same); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 13-cv-7789 (S.D.N.Y. Mar. 10, 2014), Dkt. No. 152 at 23-24 (same); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 11-md-2262 (S.D.N.Y. Mar. 25, 2013), Dkt. No. 282 at 5, Dkt. No. 489 (same); *In re Credit Default Swaps Antitrust Litigation* 13-md-02476-DLC (S.D.N.Y., Mar. 26, 2014), Dkt. No. 284 at 2 (same); *In re Treasury Securities Action Antitrust Litigation* 15-md-2673 (S.D.N.Y. Jun. 13, 2016), Dkt. No. 35, at 9, Dkt 70, at 2 (same); and *In re: Interest Rate Swaps Antitrust Litigation* 16-md-02704-PAE (S.D.N.Y. Jul. 26, 2016) Dkt. No. 92 at 2 (same).

[6] The Quinn Emanuel and Robbins Geller proposal also anticipates that, in light of the Court's preference to test the allegations before allowing discovery, the CBOE defendants would move to dismiss in a "first phase" before discovery would begin. Such a process, if adopted, would render the PSLRA stay irrelevant for yet another reason with respect to the CBOE defendants, who were the initial targets of "Doe" discovery. To clarify, we did not intend for the Court to rule at this time regarding what *non-CBOE* discovery might *also* be allowed after resolution of CBOE's motion to dismiss.

In sum, this Court has already found there are no actual conflicts requiring separate counsel at this time, and none of the competing applications justify a reversal of that decision. A multi-product/multi-claim leadership structure driven by illusory "potential conflicts" would bring no benefit to the class, but would surely create needless inefficiencies. Courts often make lead counsel appointments despite vague concerns about future conflicts, recognizing they can always revisit the leadership structure in the future, when more is known about the actual scope of the claims.[7] Notably, our procedural proposal has built-in a time for doing this, *i.e.*, at the end of the CBOE-only "first phase" of the case.

### III. THE COMPETING APPLICATIONS HAVE ALREADY DEMONSTRATED THEIR INHERENT INEFFICIENCY

The competing applications nowhere explain how it could be efficient to involve as many as six law firms in a leadership structure, let alone why the facts of this case make it necessary. *See* Federal Judicial Center, *Managing Related Proposed Class Actions in Multidistrict Litigation* (2018), at 7 ("Appointing a sufficient, but not greater than necessary, number of counsel to avoid fights and keep the attorneys working well together will best serve the class.").

To the contrary, the inefficiencies that would result from such a large leadership group are already on full display in this application process. The Court was clear that it desired "a single application" from those firms proposing a group. July 11, 2018 Hr'g Tr. at 15:3-4. Nonetheless, counsel supporting the so-called "Consensus Proposal" Application filed multiple separate submissions making duplicative arguments in support of the *same* proposal.

---

[7] *See, e.g.*, *Smith v. State Farm Mut. Auto. Ins. Co.*, 301 F.R.D. 284, 291-92 (N.D. Ill. 2014) ("If, during the prosecution of this action, evidence of an actual conflict of interest among class members arises, the Court may reevaluate whether separate counsel is necessary to protect the conflicting interests of potential class members."); *In re: Gold Fixing Antitrust and Commodity Exchange Act Litig.*, 14-cv-1459, Dkt. No. 19 (S.D.N.Y. Jun. 16, 2014) ("To be sure, some differences may exist between some of the putative class members. . . . [But t]o create putative subclasses before these potential conflicts develop places the cart before the horse at great expense to all class members.").

6

Other applications suffer from their own forms of inefficiencies and impracticalities. For example, the competing applications which propose to divide the claims among multiple firms disagree how that division should occur. *Compare* Cohen Milstein and Cafferty Clobes Application (Dkt. No. 63), at 1 (grouping claims into (i) VIX futures, (ii) VIX and SPX options, and (iii) ETPs) *with* Labaton Sucharow and DiCello Levitt Application (Dkt. No. 73), at 4 (grouping claims into (i) VIX futures and options, (ii) SPX options, and (iii) ETNs/ETFs). And other applications propose leadership structures which would result in precisely the kind of duplicative discovery that centralization is intended to avoid. *See, e.g.*, Labaton Sucharow and DiCello Levitt Application (Dkt. No. 73), at 7 (proposing that separate counsel for the securities claims "can be walled off" from ongoing discovery).

## IV. QUINN EMANUEL AND ROBBINS GELLER HAVE ALREADY DEMONSTRATED LEADERSHIP

Our opening brief documents our credentials and establishes our ability to effectively and efficiently handle *all* claims class members hold arising out of manipulation of the VIX. The competing applications not only ignore the Court's ruling that there are no actual conflicts that would prevent a single consolidated pleading managed by a small leadership team—they also ignore the Court's requests to offer concrete proposals for moving these cases forward. *See* July 11, 2018 Hr'g Tr. at 13:24-25, 14:10-16, 17:15-18.

Our CBOE-first proposal would get this case moving forward, in a streamlined fashion, without the need for pre-pleading discovery. And it would protect the viability of non-CBOE claims, by ensuring they are not brought until they are actually ripe. We believe this is exactly the type of efficient, unified, practical solution the Court was seeking. Our explicit proposal presents all of these benefits, while the path forward implicitly presumed by other applications—dividing the case up among multiple counsel then apparently running headlong into the motion to dismiss process on all fronts—presents none of them.

We note that Kessler Topaz claims to have "developed the theory of manipulation on which *all* legal claims at issue in *every* action in the MDL are based." "Consensus Proposal" Application (Dkt. No. 91), at 9. But that is a gross exaggeration, if not downright false. That the firm wants credit for filing the 20-page *Samuel* complaint that merely recited what was then in the public record would be questionable in any circumstances. It is particularly dubious here, because that complaint did not manage to name even a *single* defendant, and pled only a single cause of action against unnamed Does.[8]

In contrast to this 'race to the courthouse' approach, Quinn Emanuel and Robbins Geller filed the robust *Bueno* complaint only after conducting the extensive factual, expert, and legal research necessary to determine the proper legal theories, claims, and defendants to name. The *Bueno* complaint identified for the first time what other plaintiffs have since recognized is the correct legal regime for two of the core products at issue. And it also provides independent economic analysis of the alleged manipulation on a scale unsurpassed by the other complaints.

We respectfully submit that Quinn Emanuel and Robin Geller's commitment to investing in its complaints (rather than rushing them) demonstrates true leadership. So, too, does our willingness to think carefully about how our cases should be phased procedurally for the good of the class (and not just for the good of the plaintiffs firms overseeing them). These features, together with our extensive qualifications as set out in our initial motion, set us apart from competing applicants.

---

[8] Even Scott & Scott—Kesler Topaz's proposed co-counsel—agrees "further investigation was necessary [in respect of the allegations in Kessler Topaz's *Samuel* complaint]" before Scott & Scott were willing to file a second complaint with their name on it. Lawrence Declaration (Dkt. No. 84) ¶ 12.

## CONCLUSION

For the foregoing reasons as well as those set forth in our opening brief, we respectfully request that the Court appoint our firms as co-lead interim class counsel, and adopt our plan for the first phase of the litigation.

DATED: August 1, 2018

| | |
|---|---|
| **ROBBINS GELLER RUDMAN & DOWD LLP** | **QUINN EMANUEL URQUHART SULLIVAN, LLP** |
| By: /s/ David W. Mitchell<br>**ROBBINS GELLER RUDMAN & DOWD LLP**<br>David W. Mitchell (N.D. Ill. #199706)<br>Brian O. O'Mara (N.D. Ill. #229737)<br>Steven M. Jodlowski (N.D. Ill. #239074)<br>Ashley M. Kelly (*pro hac vice*)<br>655 West Broadway, Suite 1900<br>San Diego, California 92101<br>Telephone: (619) 231-1058<br>Fax: (619) 231-7423<br>davidm@rgrdlaw.com<br>bomara@rgrdlaw.com<br>sjodlowski@rgrdlaw.com<br>akelly@rgrdlaw.com<br><br>James E. Barz (Il. Bar #6255605)<br>Frank Richter (Il. Bar #6310011)<br>Brian E. Cochran (*admission pending*)<br>200 South Wacker Drive, 31st Floor<br>Chicago, Illinois 60606<br>Telephone: (312) 674 4674<br>Fax: (312) 674 4676<br>jbarz@rgrdlaw.com<br>frichter@rgrdlaw.com<br>bcochran@rgrdlaw.com<br><br>Patrick J. Coughlin (N.D. Ill. #90785466)<br>30 Vesey Street, Suite 200<br>New York, New York 10007<br>Telephone: (212) 693-1058<br>Fax: (619) 231-7423<br>patc@rgrdlaw.com | By: /s/ Jonathan C. Bunge<br>**QUINN EMANUEL URQUHART & SULLIVAN, LLP**<br>Jonathan C. Bunge (Il. Bar #6202603)<br>Jessica Beringer (Il. Bar #6316524)<br>Margaret Haas (Il. Bar #6309897)<br>Athena Dalton (Il. Bar #6326790)<br>191 N. Wacker Drive, Suite 2700<br>Chicago, Illinois 60606<br>Telephone: (312) 705-7400<br>Fax: (312) 705-7401<br>jonathanbunge@quinnemanuel.com<br>jessicaberinger@quinnemanuel.com<br>margarethaas@quinnemanuel.com<br>athenadalton@quinnemanuel.com<br><br>Daniel L. Brockett (*pro hac vice*)<br>Crystal Nix-Hines (*pro hac vice pending*)<br>Toby E. Futter (*pro hac vice*)<br>Christopher M. Seck (*pro hac vice*)<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Telephone: (212) 849-7000<br>Fax: (212) 849-7100<br>danbrockett@quinnemanuel.com<br>crystalnixhines@quinnemanuel.com<br>tobyfutter@quinnemanuel.com<br>christopherseck@quinnemanuel.com<br><br>Jeremy D. Andersen (*pro hac vice*)<br>865 South Figueroa Street, 10th Floor<br>Los Angeles, California 90017<br>Telephone: (213) 443-3000<br>Fax: (213) 443-3100<br>jeremyandersen@quinnemanuel.com |

9

**CERTIFICATE OF SERVICE**

I, Jonathan C. Bunge, partner at Quinn Emanuel Urquhart & Sullivan, hereby certify that on August 1, 2018, I effected service of a copy of this document by filing it on ECF in respect of all Filing Users, and that I will comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

*/s/ Jonathan C. Bunge*
Jonathan C. Bunge