UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: CHICAGO BOARD OPTIONS EXCHANGE VOLATILITY INDEX MANIPULATION ANTITRUST LITIGATION<br><br>This Document Relates to All Cases | No. 18 CV 4171<br>MDL No. 2842<br><br>Judge Manish S. Shah |

**RESPONSE IN SUPPORT OF APPLICATION FOR APPOINTMENT OF HAGENS BERMAN SOBOL SHAPIRO LLP TO PROSECUTE THE NON-PSLRA CLAIMS**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND OF INTERESTS ANTAGONISTIC TO THE CLASS ..................... 2

    A. Summary of the bases of the claims in this MDL. ............................................. 2

    B. Conflicts of interest are ripe and are briefed in the Southern District of New York. ................................................................................................................... 3

III. ARGUMENT ................................................................................................................... 5

    A. The Court should reject the applications of Robbins/Quinn and Cohen Milstein because conflicts of interest are ripe. ..................................................... 6

    B. The Court should reject the Scott/KTMC and Labaton/Levitt proposals as inefficient and duplicative. .................................................................................. 8

    C. Hagens Berman's application and the Terwilliger complaint reflect the only independent expert analysis on injury-in-fact, demonstrating zealous advocacy for the interests of the non-PSLRA class claims against Cboe alone. ............................. 9

010747-11 1051374 V2

I. INTRODUCTION

Federal Rule of Civil Procedure 23(f) and The Manual for Complex Litigation counsel that the Court should look behind the puffery of lead counsel applications and the exchange of favors among firms to consider both efficiencies of proposed structures and any conflicts among the applicants and the class they seek to represent. The application of Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), alone among the submissions before the Court, provides: (i) a coherent leadership structure that maximizes efficient and streamlined litigation; (ii) interim lead counsel whose interests are aligned with those of absent class members; and (iii) a plaintiff with unquestionable injury in fact—an issue already identified by defendants as a key area of inquiry.

The Court should reject the joint application of Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emmanuel") (together, the "Robbins/Quinn Application") and the joint application of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") and Cafferty Clobes Meriwether & Sprengel LLP (together, the "Cohen/Cafferty Application"), as both Robbins Geller and Cohen Milstein are currently seeking to serve as lead counsel in litigation arising from many of the same events at issue in this action, but that is brought on behalf of a putative class asserting claims at odds with the interests of class members here.

The Court should similarly deny the joint application of Scott + Scott Attorneys at Law ("Scott+Scott") and Kessler Topaz Meltzer & Check LLP (together, the "Scott/KTMC Application"). While this application enjoys the support of several firms, it achieves this consensus at great cost to absent class members by creating a sprawling and inefficient leadership structure with no explanation for why this configuration is needed to advance the interests of plaintiffs in this action. The proposal of Labaton Sucharow and DiCello Levitt & Casey (the "Labaton/Levitt Application), which envisions a leadership structure larger than that suggested in the Scott/KTMC application, similarly poses substantial danger of duplicative and inefficient litigation and should be rejected for the same reason.

The efficiencies to be gained from Hagens Berman's appointment as sole lead counsel is far from puffery, as demonstrated by the recent $295 million settlement and final judgment in *In re Stericycle, Inc., Sterisafe Contract Litig.*,[1] in which Judge Shadur recognized Hagens Berman for "professionalism of the highest order" and its work product as "impeccable"[2,] and Judge Gettleman reiterated that such "lavish praise" would not be stated, "without cause."[3] Judge Durkin can also attest to the importance of considering conflicts between Class Counsel applicants and the class they seek to represent at the outset, based on his appointment of Hagens Berman to represent the end-user consumer class in *In re Broilers* after conflicts were identified between prior class counsel and an overbroad class that included both wholesalers and end-user consumers.

Accordingly, Hagens Berman's application should be granted.

## II. BACKGROUND OF INTERESTS ANTAGONISTIC TO THE CLASS

### A. Summary of the bases of the claims in this MDL.

While the academic work underpinning claims of manipulation in the settlement of VIX Options and VIX Futures emerged in May of 2017[4], the first of the consolidated actions now before this Court was filed February 21, 2018.[5] The intervening event that apparently precipitated the filing of many of the current actions against Cboe[6] was a now-infamous spike in the VIX index on February 5, 2018, that resulted in the collapse of several "inverse volatility funds" negatively correlated to the VIX, including the Credit Suisse VelocityShares Daily Inverse VIX Short Term exchange-traded notes, trading under the ticker XIV.[7] The February 5

---

[1] MDL No. 2455, No. 13-C-5795 (N.D. Ill.) (Judge Shadur succeeded by Judge Gettleman).

[2] 2017 WL 4864874, at *1 (N.D. Ill. Oct. 26, 2017).

[3] Ex. 2 to Hagens Berman's Application (Transcript of Proceedings dated July 12, 2018, at 5:1-4).

[4] *See e.g.* Class Action Complaint in *Terwilliger v. Cboe Global Markets, Inc., et al.*, No. 18-03074, at ¶31.

[5] *Samuel v. John Does*, No. 18-01593 (Southern District of New York).

[6] "Cboe" here refers both to Cboe Global Markets, Inc., and to its related entities, including Cboe Futures Exchange LLC and Chicgo Board Options Exchange, Inc.

[7] *See e.g. Tomasulo v. Cboe et al.*, No. 18-02025, at ¶¶92-93.

spike and ensuing fund liquidation cost XIV investors more than $1.6 billion. *Id.* According to media reports on February 12, 2018, an anonymous SEC whistleblower has asserted that the collapse of the XIV fund was the result, at least in part, of VIX-related manipulation.[8]

Less than two weeks passed between the emergence of the whistleblower account and the filing of the first of the cases against Cboe that are now consolidated before this Court, and nearly all of the complaints ultimately filed in both the Southern District of New York and the Northern District of Illinois reiterate the whistleblower's assertions regarding the effect of VIX-related manipulation on inverse exchange-traded products such as XIV.[9] Consistent with these allegations, many of the complaints in the cases currently consolidated before this Court explicitly bring claims against Cboe on behalf of investors in XIV.[10]

**B.      Conflicts of interest are ripe and are briefed in the Southern District of New York.**

Concurrently with the filing of the complaints against Cboe, victims of the XIV liquidation filed securities fraud lawsuits in the Southern District of New York and in the Northern District of Alabama alleging that their losses were caused by the fraudulent failure of Credit Suisse, which managed the fund, to provide timely pricing information to XIV investors during the volatility event of February 5, 2018.[11] Specifically, investors alleged that "[t]he decline in Credit Suisse's Inverse VIX Short ETN [*ie*, the fund traded under the ticker XIV] was a direct result" of the revelation to the market of the fraudulent conduct of Credit Suisse and

---

[8] *Id.* at ¶94; *see also* https://www.bloomberg.com/news/articles/2018-02-13/vix-manipulation-costs-investors-billions-whistle-blower-says.

[9] *See e.g. Koza* ¶¶81-82; *Tomasulo* at ¶94; *Samuels* at ¶¶31-32. *See also Quint* Complaint (S.D.N.Y.) at ¶34 (alleging that "[t]he Whistleblower letter further provides data suggesting that "the collapse of inverse VIX ETPs on February 5, 2018 was the result of such market manipulation."); *Palatiello* Compl., ¶ 100 (N.D. Ill.) (alleging that "[t]he Whistleblower Letter suggests that the collapse of certain inverse VIX ETPs, including XIV and SVXY, was partially the result of such market manipulation.")

[10] *See e.g. Palatiello* at ¶¶ 96-100; *Elich* at ¶3; *Haldeman Realty* ¶¶87, 94.

[11] *Chahal v. Credit Suisse Group AG, et. al.*, No. 1:18-cv-02268, filed on March 14, 2018, with an Amended Complaint (hereinafter "Chahal Cmplt.") filed on March 23, 2018; *Eisenberg v. Credit Suisse AG, et. al*, No. 1:18-cv-02319, March 15, 2018; and *Qiu v. Credit Suisse AG, et. al.*, No. 1:18-cv-04045, May 4, 2018. All three complaints are attached as Exhibit A to this Memorandum.

certain of its executives,[12] and that "[h]ad Credit Suisse and [co-defendant Janus Index and Calculation Services LLC] updated the indicative value every fifteen seconds as promised, a liquidation event likely would not have occurred because the closing indicative value would have only been 77% of the previous days' value."[13]

Motions for consolidation, appointment of lead plaintiff and approval of lead counsel were filed in the Southern District of New York on May 14, 2018, by, among others, Robbins Geller and Cohen Milstein (at Docket Nos. 32 and 37, respectively).[14] Among the arguments briefed in opposition to the motion filed by Cohen Milstein was the proposition that the firm was conflicted from simultaneously representing the class in the XIV actions and a client in the actions against Cboe alleging that VIX-related manipulation caused the collapse of the XIV fund:

> The same counsel cannot adequately represent for plaintiffs in the VIX Manipulation Actions and Securities Actions. The Securities Actions attribute investor damages to defendants' misstatements concerning the indicative value of the Notes. The VIX Manipulation Actions allege losses due to manipulation in VIX-linked securities, impacting the VIX futures and other VIX-linked securities. The defendants do not overlap. Defendants in the Securities Actions will no doubt point to the allegations made and evidence adduced by Atlantic Trading's counsel in the VIX Manipulation Actions to confound loss causation in these actions.[15]

In her order appointing Cohen Milstein's client as lead plaintiff for the consolidated New York actions, Magistrate Judge Sarah Netburn concluded that such conflict arguments were not ripe, in that "[f]or there to be any basis to the [ ] argument, Cohen Milstein would have to be appointed lead counsel in the *Atlantic Trading* action".[16] The Robbins Geller firm immediately

---

[12] *Chahal* at 33-34.

[13] *Halbert*, 18-615, at ¶ 29 (N.D. Ala.).

[14] Hagens Berman filed a lead plaintiff application as well, but was not appointed as has not appealed that ruling.

[15] XIV Investor Group's Memorandum in Opposition, Docket No. 53, 18-2268 (internal references omitted).

[16] June 21, 2018 Order (Docket No. 74), attached as Exhibit B to this Memorandum, at 14.

filed an objection to the Magistrate's determination, arguing that that the Order was in error and that Robbins Geller should be approved as lead counsel in the matter.[17] This objection is now fully briefed and is pending before Judge Analisa Torres in the Southern District of New York.

Shortly before the Magistrate's ruling, Credit Suisse and certain co-defendants in the matter filed a motion to transfer before the United States Judicial Panel on Multidistrict Litigation, requesting that the Alabama action be consolidated with the actions pending before Judge Torres.[18] On July 23 the MDL panel issued a minute order calling for briefs addressing "the relationship between the actions at issue in defendants' pending motion for centralization and the actions in MDL No. 2842, IN RE: Chicago Board Options Exchange Volatility Index Manipulation Antitrust Litigation" and specifically calling for the parties to address "the extent of overlap" on the issue of "loss causation".[19] The response filed by Cohen Milstein did not address any potential "overlap" with respect to loss causation issues, and instead argued that the two sets of cases are distinct and should not be consolidated.[20]

In an order dated August 1, 2018, the MDL panel denied the motion to consolidate the XIV cases, and noted "at oral argument counsel for Credit Suisse represented that Credit Suisse will not argue that the alleged conspiracy to manipulate the VIX in MDL No. 2842 was a cause of plaintiffs' alleged losses in the Credit Suisse actions—*i.e., a confounding cause relevant to loss causation*" (emphasis added).[21] There has been no reciprocal disclaimer from Cboe in this action that it does not intend to raise misconduct by Credit Suisse as a defense to claims against it by XIV investors.

### III. ARGUMENT

Federal Rule of Civil Procedure 23 provides that "[t]he court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a

---

[17] Docket No. 75, 18-2268.

[18] MDL No. 2857, Docket No. 1.

[19] MDL No. 2857, Docket No. 27.

[20] MDL No. 2857, Docket No. 31, attached as Exhibit C to this Memorandum.

[21] MDL. No. 2857, Docket No. 33, attached as Exhibit F to this Memorandum.

- 5 -
010747-11 1051374 V2

class action." Fed. R. Civ. P. 23(g)(2)(A). In cases such as this, where there is more than one application for appointment as class counsel, the Court should appoint the applicant "best able to represent the interests of the class." Fed. R. Civ. P. 23(g)(2)(B). To this end, the Court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

A.  **The Court should reject the applications of Robbins/Quinn and Cohen Milstein because conflicts of interest are ripe.**

In appointing lead counsel on behalf of absent class members, courts play a crucial gate-keeping function in ensuring that all class members benefit from the undivided loyalty and commitment of class counsel, especially because absent members are unable to waive conflicts of interest.[22] In making this assessment, an appearance of conflict alone warrants rejection of an application for appointment.[23] The assessment of conflicts should be undertaken at the outset of the appointment (or litigation) process,[24] as recognized by courts in this District and leading ethicist and former Administrator of the Attorney Registration and Disciplinary Committee of the Supreme Court of Illinois, Mary Robinson.[25]

The duty to avoid conflicts is serious. In *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, the Second Circuit recently vacated class certification and reversed approval of a $7.25 billion settlement due to a conflict in class counsel's representation of classes

---

[22] *See Palumbo v. Tele-Commc'ns, Inc.*, 157 F.R.D. 129, 132-33 (D.D.C. 1994) ("In the class action context, the Court has an obligation to closely scrutinize the qualifications of counsel to assure that all interests, including those of as-yet unnamed plaintiffs are adequately represented.").

[23] *Molina v. Mallah Org., Inc.*, 804 F. Supp. 504, 513 n.16 (S.D.N.Y. 1992) ("In a class action, even the appearance of divided loyalties should be avoided").

[24] Rule 1.7(a) of the ABA Model Rules of Professional Conduct, as adopted by Local Rule 83.50, provides in pertinent part: "[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client…."

[25] See November 30, 2016 Declaration of Mary Robinson, Docket No. 218-1, Case No. 16-8637 (N.D.Il), attached as Exhibit D; *see also* Order, Docket No. 248, Case No. 18-8637, attached as Exhibit E.

with competing interests.[26] "[U]nitary representation of these plaintiffs was inadequate" under Rule 23(a)(4) and due process because one class was incentivized to maximize cash for past harm and the other to maximize restraints to prevent future harm.[27]

Here, both Robbins Geller and Cohen Milstein are currently battling in the Southern District of New York for the right to argue that the more than $1.6 billion in losses suffered by investors in the XIV fund is the result of fraud on the part of Credit Suisse, a company not even named in these proceedings, even as they seek in this Court to represent investors bringing claims that the XIV fund collapsed as a result of VIX-related manipulation facilitated by Cboe.[28] These two arguments cannot simultaneously be pursued with equal vigor, because the greater the liability of Credit Suisse for the liquidation of XIV, the less responsibility Cboe will claim to have had for the same losses—a problem of "overlapping" loss causation anticipated by the MDL panel considering the transfer of the XIV matters.[29]

This conflict taints not only the joint bid of Robbins Geller and Quinn Emmanuel to lead non-PSLRA claims in this consolidated litigation, but their joint application to lead the PSLRA claims as well, in that one of the consolidated cases asserting PSLRA claims against Cboe, the *Burnell* action, is brought on behalf of investors in VIX exchange-traded products, a class that would include investors in XIV.[30]

---

[26] 827 F.3d 223 (2d Cir. 2016).

[27] *Id.* at 233.

[28] The Court should scrutinize the response memoranda of both Cohen Milstein and the Quinn/Robbins slate to determine whether either applicant raises the potential dangers posed by this conflict. If neither does for fear of flagging a defect that both applications share equally, the Court would rightly be concerned about the ability of both teams to provide zealous and impartial counsel to absent class members. *Compare* Exhibit E at 2 (appointing Hagens Berman as interim class counsel "in large part because of their aggressive and independent advocacy relating to the conflict that the Court earlier identified.")

[29] Cboe has made no representation in this action that it will address this "confounding issue of loss causation" by waiving any argument that the losses of XIV investors may, in part, be the result of misconduct on the part of Credit Suisse.

[30] *See Burnell* Complaint, 18-03355, at ¶ 73. Compare Complaint in *Bueno*, disclaiming claims based on inverse-volatility funds such as XIV at fn. 13.

The conflict concerns are just as great with respect to the appointment of Cohen Milstein, which has already tentatively been appointed lead counsel in the XIV actions against Credit Suisse in the Southern District of New York.[31] Magistrate Judge Netburn, in her order appointing Cohen Milstein as Lead Counsel in that matter, understood that appointment of Cohen Milstein as a lead counsel in this matter would make manifest a conflict that she then viewed as only potential.[32]

### B. The Court should reject the Scott/KTMC and Labaton/Levitt proposals as inefficient and duplicative.

In fashioning a leadership structure for this consolidated action, the Court should be wary of "full employment" arrangements that buy peace among otherwise competing law firms at the expense of efficient litigation. The creation of a formal committee is "most commonly needed when group members' interests and positions are sufficiently dissimilar to justify giving them representation in decision making."[33] While the Scott/KTMC application's suggestion resolves competing claims on leadership among several firms, its five-firm structure is bloated and unrelated to any differences among the products or time periods at issue. No explanation is offered for why, in the era of electronic filing, the assistance of liaison counsel is necessary, a role that the appointment of Hagens Berman, with an office in Chicago, would make moot.[34]

Furthermore, the proposed structure minimizes the institutional knowledge and other benefits absent class members would derive from, for example, having the same small group of attorneys depose multiple defendants. Hagens Berman has led the litigation of complex class

---

[31] In their submission, Cohen Milstein offers the Court quixotic argument for the proposition that investors in VIX Options should not get the benefit of protections offered by the Commodities Exchange Act. Docket No. 63 at 6. While these claims find little support in the law, they underscore Cohen Milstein's unsuitability to serve as counsel for investors bringing such claims.

[32] June 21, 2018 Order (Docket No. 74), attached as Exhibit B to this Memorandum, at 14.

[33] Manual for Complex Litigation § 10.221.

[34] *In re Cendant Corp. Litig.*, 182 F.R.D. 144, 152 (D.N.J. 1998)(declining to appoint liaison counsel as "[q]ualified lead counsel will be surely capable of performing these ministerial tasks").

action cases with even more defendants and products without a committee apparatus to coordinate litigation.[35]

The proposed structure described in the Labaton/Levitt application is equally unwieldy and should be rejected for the same reasons. While their application offers a rationale for a three-member plaintiffs steering committee based on distinct product types, they offer no similar justification for the appointment of a leadership committee of three co-lead counsel, of which their firms would make up two. The inability of Labaton and Levitt to offer any reasons for this tripartite leadership group augurs poorly for the efficient litigation of this case on behalf of the class.

C.  **Hagens Berman's application and the Terwilliger complaint reflect the only independent expert analysis on injury-in-fact, demonstrating zealous advocacy for the interests of the non-PSLRA class claims against Cboe alone.**

Hagens Berman recognizes that this Court does not consider the plaintiffs' standing as a gating issue for leadership appointment. We thus raise this issue to demonstrate the unique work with experts Hagens Berman has undertaken pursuant to Fed. R. Civ. P. 23(g)(A)(1)(a), which requires the Court to consider "the work counsel has done in identifying or investigating potential claims in the action."

In their response to the Court's previous request for proposals regarding a leadership structure for this case, the Cboe defendants flagged their early focus on the nature of the injury suffered by the plaintiffs in the consolidated actions, arguing that:

> If or when Doe discovery proceeds, the Court should ensure that the consolidated complaint contains specific allegations of manipulative market activity that harmed Plaintiffs. Many complaints only speculatively assert that the VIX or the VIX settlement values calculated on expiration days are susceptible to manipulation. But generic allegations that abuses were ongoing when plaintiffs "purchased and/or sold futures contracts" or

---

[35] *See, e.g. In re Broilers Antitrust Litig.*, Case. No. 16-8637, in the Northern District of Illinois, in a nation-wide class action case in which Hagens Berman served as interim lead counsel in a case with 14 defendants; *In re Electronic Books Antitrust Litig*, Case No. 11-2293 (Southern District of New York)(in which Hagens Berman served as interim lead counsel in case with six defendants).

securities are insufficient: a complaint must plead "actual losses" on "specific transactions." [36]

In his complaint, Mr. Terwilliger identifies not the transactions and settlement days on the basis of which he claims injury, but a detailed expert analysis assessing the harm he suffered as a result of the manipulation alleged. No similar analysis has been offered in the complaints filed by the competing applicants for leadership. The care that Hagens Berman exercised in ensuring that claims be brought by a representative best able to survive any attack on standing is a testimonial to the firm's ability to zealously pursue the interests of other class members.

DATED: August 1, 2018

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: /s/ Steve W. Berman
    Steve W. Berman
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
E-mail: steve@hbsslaw.com

Michael Stocker
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Ave., Suite 202
Berkeley, CA 94710
(510) 725-3033 office
(510) 725-3001 fax
mikes@hbsslaw.com

Elizabeth A. Fegan
Mark Vazquez
Zoran Tasić
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
E-mail: beth@hbsslaw.com

---

[36] Cboe Memorandum in Response to Court's June 26 Order (Docket No. 41) at 4.

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on August 1, 2018, a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By: */s/ Steve W. Berman*
Steve W. Berman

010747-11 1051374 V2